# Authority of the Federal Financing Bank to Provide Loans to the Resolution Trust Corporation

The Resolution Trust Corporation is a "federal agency" within the meaning of the Federal Financing Bank Act of 1973, and the RTC is authorized to issue financial obligations under the Federal Home Loan Bank Act. Accordingly, under the FFB Act the Federal Financing Bank is authorized to provide loans to the RTC.

February 14, 1990

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

This memorandum responds to your request for our views as to whether the Federal Financing Bank ("the Bank") is authorized to provide loans to the Resolution Trust Corporation ("RTC"). Section 6 of the Federal Financing Bank Act of 1973 ("the FFB Act"), 12 U.S.C. § 2285, authorizes the Bank to provide loans by directly purchasing notes or other obligations from any "Federal agency" that is authorized to issue such obligations. As explained more fully below, we conclude that RTC is a "Federal agency" within the meaning of the FFB Act and that RTC is authorized to issue obligations by virtue of its authority under section 21A(b)(4) of the Federal Home Loan Bank Act, 12 U.S.C. § 1441a(b)(4). Accordingly, we conclude that the Bank may provide loans to RTC by directly purchasing RTC notes or obligations.

## I. Background

The Federal Financing Bank was created in 1973 to reduce the cost of federal and federally assisted borrowing by coordinating financing programs among various federal agencies. Prior to enactment of the FFB Act, many agencies financed their programs by issuing their own debt securities directly into the market. H.R. Rep. No. 299, 93d Cong., 1st Sess. 2 (1973), *reprinted in* 1973 U.S.C.C.A.N. 3153, 3154. This required the agencies to develop their own financing staffs and consequently to incur significant under-

20

writing costs. Lack of coordination among agencies in timing the introduction of various issues into the market and liquidity costs associated with having a proliferation of competing small issues also increased borrowing costs. *Id.*

The FFB Act reduced these costs by allowing agencies to issue obligations directly to the Bank, which would then issue its own securities into the market or directly to the Treasury, which is the current procedure. Section 6 of the Act provides, in part, that "[a]ny Federal agency which is authorized to issue, sell, or guarantee any obligation is authorized to issue or sell such obligations directly to the Bank." 12 U.S.C. § 2285(a). The Bank thus may provide financing for the Resolution Trust Corporation if, within the meaning of the FFB Act, (1) RTC is a "Federal agency," and (2) RTC is authorized to "issue, sell, or guarantee any obligation[s]."

## II. Discussion

### A. *RTC is a "Federal Agency" Within the Meaning of the FFB Act*

We believe that RTC is a federal agency within the meaning of the FFB Act. Section 3(a) of the Act provides that the term "'Federal agency' means"

> an executive department, an independent Federal establishment, or a corporation or other entity established by the Congress which is owned in whole or in part by the United States.

12 U.S.C. § 2282(1). In our view, RTC is a "corporation or other entity established by the Congress which is owned in whole or in part by the United States."[1]

#### 1. *Scope of the Corporation Coverage Clause*

There is no dispute that RTC is a "corporation" and that it was "established by the Congress." *See* Federal Home Loan Bank Act, section 21A(b)(1)(A), as added by Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, § 501, 103 Stat. 183, 369 (codified at 12 U.S.C. § 1441a(b)(1)(A)) ("There is hereby established a Corporation to be known as the Resolution Trust Corporation . . . ."). The central question in determining whether RTC is a "Federal agency" within the meaning of the FFB Act therefore is whether it is "owned in whole or in part by the United States."

The FFB Act does not define the phrase "owned in whole or in part by the United States." Ordinarily, ownership in a corporation is a function of stock ownership: Under general principles of corporate law, one has an

---

[1] Throughout this opinion, we will refer to this phrase as the "corporation coverage clause."

21

ownership interest in a corporation if he or she owns capital stock in that corporation. Stock ownership in turn entitles the holder to certain ownership rights. This conventional ownership test, however, is not especially helpful in determining ownership in government corporations. Several government corporations, such as the Tennessee Valley Authority and the Government National Mortgage Association, were intended to be "Federal agencies" within the scope of the corporation coverage clause, but they do not issue stock at all.[2] *See* 16 U.S.C. §§ 831-831dd (outlining powers and duties of TVA); 12 U.S.C. §§ 1716-1724 (1970 & Supp. III 1973) (outlining powers and duties of GNMA); *see also infra* pp. 22-24. Private capital contributions to government corporations, moreover, do not always entitle contributors to the kind of ownership rights that typically follow from capital investment in private corporations. For example, although RTC issues "capital certificates" to the Resolution Funding Corporation ("REFCORP"), a private corporation that raises money for RTC by selling REFCORP bonds, these certificates entitle REFCORP to few of the usual rights of corporate ownership. The certificates are nonvoting, pay no dividends, and do not provide REFCORP with any control over the management of RTC. *See infra* pp. 29-30. Thus, the precise scope of the corporation coverage clause is difficult to discern from the text of the clause alone.

The legislative history of the FFB Act, however, provides further guidance on the meaning of the clause by providing examples of the kinds of corporate entities that were and were not intended to be covered by the clause. By contrasting the characteristics of the included and excluded entities, one can glean a clearer understanding of the reach of the clause.

The legislative history shows that Congress intended the FFB Act[3] to cover a range of corporate entities, including the Government National Mortgage Association, 118 Cong. Rec. 22,015 (1972); the Export-Import Bank of the United States, 119 Cong. Rec. 36,004 (1973), *1973 House Hearings* at 15; the Commodity Credit Corporation, *id.*; S. Rep. No. 166, 93d Cong., 1st Sess. 5 (1973); and the Tennessee Valley Authority, H.R. Rep. No. 299 at 5, 1973 U.S.C.C.A.N. at 3157; *1973 House Hearings* at 33.[4] In contrast to the excluded corporations, *see infra* pp. 24-26, the essential characteristics of

---

[2] Despite its eligibility to finance certain issues through the Bank, *see Federal Financing Bank Act: Hearings Before the House Comm. on Ways and Means*, 93d Cong., 1st Sess. 15 (1973) ("*1973 House Hearings*") (GNMA mortgage-backed securities); 118 Cong. Rec. 22,015 (1972) (same), GNMA has never done so.

[3] The original Federal Financing Bank bill, S. 3001, passed in the Senate during the second session of the Ninety-Second Congress in 1972 was favorably reported by the House Ways and Means Committee. The full House, however, was not able to act upon the bill before adjournment. H.R. 5874, the bill ultimately enacted during the first session of the Ninety-Third Congress in 1973, was very similar to S. 1001 and included the identical definition of "Federal agency." *Compare* S. 3001, 92d Cong., 2d Sess. (1972) *with* H.R. 5874, 93d Cong., 1st Sess. (1973).

[4] By statute, all of these entities were defined as "corporate" entities. 12 U.S.C. § 1717(a)(2)(A) (1970) (GNMA); *id.* § 635(a) (Export-Import Bank); 15 U.S.C. § 714 (1970) (Commodity Credit Corporation); 16 U.S.C. § 831 (1970) (TVA). Although TVA is a "Federal agency" eligible to borrow from the Bank under section 6 of the FFB Act, the TVA is exempt from the prior approval requirements of section 7 of the Act, 12 U.S.C. § 2286. *See infra* note 7.

each of these covered corporate entities were typical of the characteristics of government entities generally. Each of these corporations received government funding, was subject to significant federal oversight and, with one exception, generally issued securities backed by the full faith and credit of the federal government.[5]

Each of these four corporations received substantial government funding. Two of them received direct capital contributions from the United States, *see* 12 U.S.C. § 635b (1970) ($1,000,000,000 for Export-Import Bank); 15 U.S.C. § 714e (1970) ($100,000,000 for Commodity Credit Corporation), and at least three received direct appropriations. *See* Pub. L. No. 93-137, 87 Stat. 491, 491 (1973) ($19,821,000 for GNMA); Pub. L. No. 93-135, 87 Stat. 468, 477 (1973) ($3,301,940,000 for Commodity Credit Corporation); Pub. L. No. 93-97, 87 Stat. 318, 328 (1973) ($45,676,000 for TVA).

These corporations were generally subject to closer federal oversight than were the excluded corporations, *see infra* pp. 25-26, although the precise relationship of the various corporations to the federal government differed. Indeed, two of the four covered corporations were placed within executive departments. *See* 12 U.S.C. § 1717(a)(2)(A) (1970) (declaring GNMA to be a body corporate within the Department of Housing and Urban Development); *id.* § 1723(a) (powers and duties of GNMA vested in the Secretary of HUD); 15 U.S.C. § 714 (1970) (Commodity Credit Corporation is an instrumentality of the United States within the Department of Agriculture and subject to the general supervision and direction of the Secretary of Agriculture).[6]

The principal officers and directors of these covered corporations were not elected by private entities; they were appointed directly by the President or by the head of an executive department. *See* 12 U.S.C. § 1723(a) (1970) (Secretary of HUD selects president, vice-president, and other principal officers of GNMA); *id.* § 635a(b) & (c) (board of directors of Export-Import Bank, which includes its president and first vice-president, are appointed by President with advice and consent of the Senate); 15 U.S.C. § 714g(a) (1970) (six members of board of directors of Commodity Credit Corporation appointed by President with advice and consent of the Senate; Secretary of Agriculture is a member *ex officio* and serves as Chairman); 16 U.S.C. § 831a(a) (1970) (board of directors of TVA appointed by President with advice and consent of the Senate).

---

[5] The significance of the references to these corporations for purposes of determining congressional intent is not so much that we know whether these particular corporations were to be covered or not (although this is important), but rather that we know the *types* of corporations Congress did and did not intend to be covered. Indeed, several of these particular entities have been substantially restructured since the FFB Act was enacted in 1973. Of course, changes in the structure, management and/or funding of these corporations after the date of enactment of the FFB Act are irrelevant to determining Congress' intent in enacting the legislation. We have considered, therefore, only their structure and operations at the time the FFB Act was considered and enacted.

[6] The other covered corporations functioned as independent agencies of the United States *See, e.g.*, 12 U.S.C. § 635(a) (1970) (Export-Import Bank).

23

Finally, each of these corporations, except for the Tennessee Valley Authority, generally issued obligations that were backed by the full faith and credit of the United States government.[7] *See* 12 U.S.C. § 635k (1970) ("All guarantees and insurance issued by the [Export-Import] Bank shall be considered contingent obligations backed by the full faith and credit of the Government of the United States of America."); 15 U.S.C. § 713a-4 (1970) (obligations of Commodity Credit Corporation "shall be fully and unconditionally guaranteed both as to interest and principal by the United States"); 12 U.S.C. § 1721(g) (Supp. III 1973) (full faith and credit of United States pledged to payment of certain GNMA obligations); *but see* 12 U.S.C. § 1721(b) (1970) (certain other GNMA obligations not backed by government).

The characteristics of these covered corporations were very different from the characteristics of those entities that we know from the legislative history were intended to be excluded from coverage. The committee reports on the FFB Act state that the Act would *not* cover the federal land banks, the federal intermediate credit banks, the banks for cooperatives, the federal home loan banks, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, and the federal reserve banks. H.R. Rep. No. 299, at 5, 1973 U.S.C.C.A.N. at 3157; S. Rep. No. 166, at 3. At the time, all of these excluded corporations were wholly privately financed, had significant management independence and, with one exception,[8] did not issue obligations backed by the full faith and credit of the United States.

The Federal National Mortgage Association, the federal home loan banks, the banks for cooperatives, the federal land banks, and the federal intermediate credit banks were initially capitalized in part by contributions from the United States.[9] However, by the time the FFB Act was enacted, the shares

---

[7] The bulk of TVA's existing borrowing authority in 1973 consisted of obligations that were not guaranteed by the government, *see* 16 U.S.C. § 831n-4(b) (1970), but TVA had previously issued bonds that were backed by the full faith and credit of the United States, *see id.* §§ 831n-1 & 831n-3. Indeed, in order to exempt TVA from the prior approval requirements of the FFB Act, Congress inserted a clause into section 7 of the Act exempting from these requirements any "obligations issued or sold pursuant to an Act of Congress which expressly prohibits any guarantee of such obligations by the United States." 12 U.S.C. § 2286(a). This exemption would apply to few, if any, agencies other than TVA, because virtually all federal agencies covered by the FFB Act issued obligations backed by the government.

[8] Federal Reserve notes were and continue to be "obligations of the United States," 12 U.S.C. § 411 (1970), backed by the federal government. The FFB Act, however, expressly excludes from its coverage "Federal Reserve notes." 12 U.S.C. § 2282(2). Thus, notwithstanding their private capitalization and substantial day-to-day management independence, the federal reserve banks could not obtain financing from the Bank by issuing "Federal Reserve notes" to the Bank.

[9] *See* 12 U.S.C. § 1718(a) & (d) (1970) (FNMA); *id.* § 1426(f)
(federal home loan banks); *id.* § 1134d(a)(1) (banks for cooperatives), *repealed by* Pub. L. No. 92-181, § 5.26(a), 85 Stat. 583, 624 (1971); 12 U.S.C. §§ 692 & 695 (1970) (federal land banks), *repealed by* Pub. L. No. 92-181, § 5.26(a); 12 U.S.C. § 1061(a)(1) (1970) (federal intermediate credit banks), *repealed by* Pub. L. No. 92-181, § 5.26(a).

of the United States had been retired, and these entities were entirely privately capitalized.[10] Although the federal reserve banks were originally authorized to issue stock to the United States, they had never done so. *See* 12 U.S.C. note following section 284 (1970). The Federal Home Loan Mortgage Corporation ("FHLMC") had, from its inception, obtained all of its equity capital from private sources. *See* 12 U.S.C. § 1453 (1970).

In addition to being fully privately capitalized, these entities generally relied solely upon their own income, rather than upon appropriations, to fund their operating expenses. *See 1974 Budget Appendix, supra* note 10, at 1098 ("The entire operating expenses of the [Federal Home Loan Banks] are paid from their own income and are not included in the budget of the United States."); *id.* at 1094 (banks for cooperatives); *id.* at 1097 (federal land banks); *id.* at 1095 (federal intermediate credit banks).

These corporations were relatively independent in the management of their day-to-day affairs, although the extent of direct federal supervision differed substantially. With one exception,[11] private entities elected a substantial majority of the boards of directors of each of these corporations, and the shares issued by these corporations consisted of voting stock. Thus, two-thirds of the directors of the FNMA, the federal reserve banks, and the federal home loan banks were elected by the respective shareholders and members of these entities. *See* 12 U.S.C. § 1723(b) (1970) (FNMA); *id.* §§ 302 & 304 (federal reserve banks); *id.* § 1427(a) (federal home loan banks). Similarly, private parties elected a substantial majority of the boards of directors of the three types of farm credit banks. Under 12 U.S.C. § 2224 (Supp. III 1973), the same seven members of the board of directors of each farm credit district served as the board of directors for the federal land bank, the federal intermediate credit bank, and the bank for cooperatives of each such district. Six of the seven members were elected by private entities:

---

[10] *See* 12 U.S.C. § 1718(a) (1970) (requiring retirement of preferred shares in FNMA held by the Secretary of the Treasury); *id.* § 1426(g) (retirement of stock held by the United States in federal home loan banks); 12 U.S.C. § 2126 (Supp. III 1973) (providing for retirement of stock held by the Governor of the Farm Credit Administration in the banks for cooperatives); U.S. Bureau of the Budget, *The Budget of the United States Government, Fiscal Year 1974, Appendix* at 1094 (1973) ("*1974 Budget Appendix*") (U.S. Government capital m banks for cooperatives was fully retired on December 31, 1968); *id.* at 1097 ("The last of the Government capital that had been invested in the [federal land banks] was repaid in 1947."); 12 U.S.C. § 2073(g) (Supp. III 1973) (providing for retirement of stock held by the Farm Credit Administration in the federal intermediate credit banks); *1974 Budget Appendix* at 1095 (government-held stock in federal intermediate credit banks was fully retired on December 31, 1968). Although the various farm credit banks were authorized to issue nonvoting stock to the Governor of the Farm Credit Administration on a temporary basis when needed to meet emergency credit needs of borrowers, *see* 12 U.S.C. § 2151(a) (Supp. III 1973); *see also id.* §§ 2013(d), 2073(d) & 2124(e) (authorizing issuance of nonvoting stock to Governor of the Farm Credit Administration), the ownership of such stock was, for most purposes, expressly "deemed to not change the status of ownership of the banks," *id.* § 2151(a), and such stock was required to be retired when no longer needed. *See id.* § 2151(b)

[11] The members of the Federal Home Loan Bank Board, who were appointed by the President with the advice and consent of the Senate, *see* Reorganization Plan No. 3 of 1947, § 2(a), 3 C.F.R. 1071, 1072 (1943-1948), *reprinted in* 12 U.S.C. § 1437 note at 2532 (1970), served as the board of directors of the Federal Home Loan Mortgage Corporation. 12 U.S.C. § 1452(a) (1970).

two were elected by the shareholders of the federal land bank for that farm credit district, two by the shareholders of the federal intermediate credit bank, and two by the shareholders of the bank for cooperatives. 12 U.S.C. § 2223(a) (Supp. III 1973).[12]

Finally, each of these corporations (except the federal reserve banks[13]) issued obligations that were not guaranteed by the full faith and credit of the United States government. Indeed, for most of these corporations there was an express statutory bar to full faith and credit pledges. *See* 12 U.S.C. § 1719(b) (1970) (FNMA); *id.* § 1435 (federal home loan banks); 12 U.S.C. § 2155(c) (Supp. III 1973) (federal land banks, federal intermediate credit banks, and banks for cooperatives). Although no provision expressly barred FHLMC from issuing obligations backed by the federal government, section 306(c) of the Federal Home Loan Mortgage Corporation Act, 12 U.S.C. § 1455(c) (1970), provided that the obligations of the corporation would be guaranteed, if at all, *by the federal home loan banks*. There was no provision for FHLMC's obligations to be backed by the full faith and credit of the United States.

From this review of the entities that we know Congress considered and determined were either covered or not, it is relatively clear that the Act was intended generally to reach a range of federally created corporations that receive substantial funding from the government, that are subject to significant federal control, and that issue obligations guaranteed by the federal government. On the other hand, the Act was intended generally to exclude the fairly small group of federally created corporations that are wholly privately funded, that have a significant measure of independence in their management, and that issue obligations not backed by the full faith and credit of the federal government.[14] The apparent purpose of excluding from coverage this latter type of corporation was to prevent privately owned insti-

---

[12] Section 2223(a) provided, in part, that:

    Two of the district directors shall be elected by the Federal land bank associations, two
    by the production credit associations, and two by the borrowers from or subscribers to
    the guaranty fund of the bank for cooperatives.

These three groups which, in turn, were fully privately owned and managed, *see* 12 U.S.C. §§ 2032 & 2034 (Supp. III 1973) (federal land bank associations — which were distinct entities from the federal land banks); *id.* §§ 2092 & 2094 (production credit associations), were the respective shareholders of the federal land banks, *id.* § 2013(b), the federal intermediate credit banks, *id.* § 2073(b), and the banks for cooperatives, *id.* §§ 2124(c) & 2127.

[13] Federal Reserve notes were obligations of the United States backed by the federal government. *See supra* note 8.

[14] Of course, any given corporation may not have all of the principal characteristics of either the included or excluded corporations mentioned above, or it may have the characteristics of one or the other, but to a lesser or greater extent. In these circumstances, one must determine, with due regard for the purposes of the FFB Act, whether the corporation's principal characteristics render it most analogous to those corporations that were intended to be covered by the FFB Act or to those that were not.

tutions from obtaining the advantages of Bank financing, in particular the benefit of financing backed by the full faith and credit of the United States. *See infra* note 16.[15]

The few actual discussions of the scope of the corporation coverage clause in Congress or in the materials submitted in connection with the legislation are fully consonant with these conclusions concerning the scope of the clause. The original Federal Financing Bank bill was proposed by the Department of the Treasury, and the definition of "Federal agency" was taken unaltered from the language of that original Treasury proposal. *Compare* 12 U.S.C. § 2282 *with* Letter from John B. Connally, Secretary of the Treasury, to Carl B. Albert, Speaker of the House of Representatives (Dec. 9, 1971) (attaching draft bill). In submitting the proposed bill, the Secretary of the Treasury emphasized that the corporation coverage clause was intended to exclude "Government-sponsored agencies which are entirely privately owned and issue obligations which are not directly guaranteed by the Government." *Id.*

The Secretary's understanding of the clause as excluding from coverage government corporations that were wholly privately owned and whose obligations were not backed by the government is supported by testimony given by Paul Volcker, then-Under Secretary of the Treasury for Monetary Affairs, before the House Committee on Ways and Means. In the course of extensive questioning concerning the coverage of the proposed legislation, Mr. Volcker reiterated that wholly privately owned corporations were excluded from coverage. He explained that one of the principal reasons for excluding these corporations was to prevent them from issuing to the Federal Financing Bank securities that were not government-backed in exchange for Bank financing that would be backed by the full faith and credit of the United States.[16] These comments, especially taken together with others to the effect

---

[15] These conclusions as to the reach of the clause are supported by the treatment of government-sponsored agencies in the annual Budgets of the United States. The list of corporations that the House and Senate Reports stated were excluded from the FFB Act's coverage closely corresponds to the list of "government-sponsored credit agencies" contained in the appendix to the annual Budget report. Thus, for example, the appendix to the Fiscal Year 1974 Budget (which was the last to be submitted before the FFB act was passed) lists six such entities: the FNMA, the banks for cooperatives, the federal intermediate credit banks, the federal land banks, the federal home loan banks, and the FHLMC *See 1974 Budget Appendix* at 1084, 1092-1100. This almost exact correspondence with the list of excluded corporations is not coincidental; these corporations are excluded from the normal budgetary process because they are considered to be "privately owned." *Id.*; *see also Report of the President's Commission on Budget Concepts* 30 (1967) ("Government-sponsored enterprises [should] be omitted from the budget when such enterprises are completely privately owned.").

[16] Mr. Volcker testified that there were two basic reasons for excluding certain "privately owned enterprise agencies":

> One is that these institutions are privately owned, and there is some philosophic question in our mind, if you will, whether privately owned institutions should in the nature of things have access to this bank, which, of course, will be emitting full faith and credit securities of the United States.
>
> [Second,] [i]f you look at the practicalities, these agencies . . . are large borrowers and they are well established and have a niche in the market, so to speak. . . . Their securities are somewhat more easily traded than many of the securities that we do cover here.

*Federal Financing Bank Act: Hearings on S. 3001 Before the House Comm. on Ways and Means*, 92d Cong., 2d Sess. 26-27 (1972) ("*1972 House Hearings*").

27

that the term "Federal agency" was intended to have a broad reach, *see, e.g., Federal Financing Authority: Hearings on S. 1015, S. 1699, S. 3001 & S. 3215 Before the Senate Comm. on Banking, Housing and Urban Affairs*, 92d Cong., 2d Sess. 14 (1972) (statement of Paul Volcker) (there were to be few exceptions to the coverage of the FFB Act), confirm our conclusions concerning the relatively narrow scope of the exclusion.

## 2. *The Resolution Trust Corporation*

RTC clearly most resembles the corporate entities that were intended to be covered by the Act. It has all of the principal characteristics of the covered corporations; it has none of the principal characteristics of the entities that were intended to be excluded. First,[17] RTC has received substantial funding from the federal government. Congress ordered the Treasury to provide RTC $18.8 billion in fiscal year 1989 and authorized the Secretary to use the proceeds from the sale of Treasury securities to supply the necessary funds. 12 U.S.C. § 1441a(b)(14).

Second, RTC is subject to significant federal oversight and control. The day-to-day operations of RTC are managed by the Federal Deposit Insurance Corporation ("FDIC"), subject to the ultimate oversight of a new federal agency, the "Oversight Board." *Id.* § 1441a(a). Unless removed by the Oversight Board, *see* 12 U.S.C. § 1441a(m), the FDIC functions as the exclusive manager of RTC, *see* 12 U.S.C. § 1441a(b)(1)(C), and the members of the FDIC board of directors serve as the board of directors of RTC, *see id.* § 1441a(b)(8)(A). RTC's directors therefore are not selected by private entities; they are ex officio members who were appointed to their respective positions at the FDIC by the President with the advice and consent of the Senate.[18]

The Oversight Board has ultimate oversight responsibility for RTC. 12 U.S.C. § 1441a(a).[19] It sets the "overall strategies, policies, and goals" of

---

[17] FIRREA describes RTC as "an instrumentality of the United States," declares that it is an "agency of the United States" for certain purposes, and states that, despite the fact "that no Government funds may be invested in the Corporation," it shall be treated, for purposes of the Government Corporation Control Act, "as a mixed-ownership Government corporation which has capital of the Government." 12 U.S.C. § 1441a(b)(1) & (2). At first blush, it might appear that these references to RTC as a government agency would alone resolve the question whether it is a federal agency within the meaning of the FFB Act. However, several of the corporations that Congress expressly intended to exclude from coverage under the FFB Act were also considered to be "instrumentalities" and "mixed-ownership Government corporations" for certain purposes. *See* 12 U.S.C. § 2011 (Supp. III 1973) (federal land banks were "federally chartered instrumentalities of the United States"); *id.* § 2071 (federal intermediate credit banks); *id.* § 2121 (banks for cooperatives); 31 U.S.C. § 856 (1970) (federal home loan banks, federal land banks, federal intermediate credit banks, and banks for cooperatives were "mixed-ownership Government corporations" for purposes of the Government Corporation Control Act).

[18] Section 2(a)(1) of the Federal Deposit Insurance Act, 12 U.S.C § 1812(a)(1), as amended by FIRREA, Pub. L. No. 101-73, tit. II, § 203, 103 Stat. 183, 188 (1989), provides that the board of directors of the FDIC consists of five members: the Comptroller of the Currency, the Director of the Office of Thrift Supervision, and three other individuals to be appointed by the President with the advice and consent of the Senate. The Director of the Office of Thrift Supervision is also a presidential appointee, *see* 12 U.S.C. § 1462a(c)(1), as is the Comptroller of the Currency, *see id.* § 2.

RTC. *Id.* § 1441a(a)(6). This authority includes the power to establish the general policies and procedures for RTC's handling of case resolutions, its management and disposition of assets, and its use of debt securities, as well as the power to establish RTC's overall financial goals and its budget. *Id.* § 1441a(a)(6)(A).

The Oversight Board also reviews all rules and regulations issued by RTC, and may, within certain limits, require modifications in these regulations. *Id.* § 1441a(a)(6)(C). The Oversight Board also periodically reviews the overall performance of RTC. *Id.* § 1441a(a)(6)(D). Moreover, under certain specified circumstances, the Oversight Board is authorized to remove the FDIC as exclusive manager of RTC and to appoint a new board of directors and chief executive officer. Thus, although the Oversight Board is not involved in RTC's day-to-day resolution of specific cases, *see id.* § 1441a(a)(8)(A); H.R. Conf. Rep. No. 222, 101st Cong., 1st Sess. 410, *reprinted in* 1989 U.S.C.C.A.N. 432, 449, the Board's expansive authority over RTC's operations illustrates the substantial degree of federal governmental control over RTC.

Finally, FIRREA provides that the full faith and credit of the United States is pledged to the payment of any obligation issued by RTC, provided only that the obligation expressly states its principal amount and date of maturity. 12 U.S.C. § 1441a(j)(3).

RTC technically has not received capital contributions from the Treasury in exchange for RTC capital certificates. This alone, however, does not prevent RTC from being covered under the Act. First, other corporations that were clearly intended to be covered by the FFB Act, such as GNMA and TVA, had no outstanding stock owned by the United States. Second, although RTC issues "capital certificates" to REFCORP[20] in exchange for REFCORP's compulsory cash contributions, 12 U.S.C. § 1441a(b)(10)(M), these certificates do not confer many of the ordinary entitlements of corporate ownership. The certificates are nonvoting, pay no dividends, and do not provide REFCORP with any control over the management or operation of RTC.[21] Third, if REFCORP's possession of these certificates were alone considered sufficient to render RTC a wholly privately owned entity, it would be difficult to explain the need for two separate entities. REFCORP would

---

[19] The Oversight Board is comprised of five members: the Secretary of the Treasury (who serves as Chairman), the Chairman of the Board of Governors of the Federal Reserve System, the Secretary of Housing and Urban Development, and two other individuals appointed by the President with the advice and consent of the Senate. 12 U.S.C. § 1441a(a)(3).

[20] REFCORP is a private entity which is fully capitalized by the federal home loan banks, and which raises money for RTC by selling REFCORP bonds, which are not backed by the full faith and credit of the United States. 12 U.S.C. § 1441b(d)(3), (e), (f)(4) & (10). FIRREA, however, does establish a Financing Corporation Principal Fund, which consists of zero-coupon Treasury securities purchased with funds obtained from the federal home loan banks, to ensure principal payments on REFCORP bonds. FIRREA also provides that the Secretary of the Treasury shall provide funds for REFCORP bond interest payments that are not otherwise covered. *Id.* § 1441b(f)(2)(E)(i) & (g)(2).

[21] REFCORP does retain a residual claim on the net assets of RTC, if any, after RTC is terminated. At that point, RTC's assets and liabilities are transferred to the "FSLIC Resolution Fund," which, after selling the assets, transfers any net proceeds to REFCORP. 12 U.S.C. §§ 1441a(o)(2) & 1821a(e).

be unnecessary if it were merely a funding mechanism for another private corporation.

Because RTC receives substantial government funding, is subject to significant federal control, and issues obligations backed by the full faith and credit of the United States, we believe that it is a "corporation . . . established by the Congress which is owned in whole or in part by the United States," as that phrase is used in the FFB Act.[22] Accordingly, we conclude that RTC is a "Federal agency" within the meaning of the Act.[23]

## B. *RTC is Authorized to Issue "Obligations" Within the Meaning of the FFB Act*

RTC must not only be a Federal agency, but also must be authorized to "issue, sell, or guarantee any obligation" within the meaning of the FFB Act to be eligible for FFB financing. Section 3(2) of the Act provides that the term "obligation" means

> any note, bond, debenture, or other evidence of indebtedness, but does not include Federal Reserve notes or stock evidencing an ownership interest in the issuing federal agency.

12 U.S.C. § 2282(2). The term thus is broadly defined to include virtually any paper evidencing indebtedness. As explained below, we conclude that RTC is authorized to issue "obligations" within the meaning of the FFB Act because FIRREA authorizes RTC to issue notes in connection with its case resolution duties.

No provision of FIRREA expressly grants RTC the authority to issue obligations. Subsection 21A(b)(4) of the Federal Home Loan Bank Act ("the FHLB Act") as added by FIRREA, however, provides that, subject to certain limitations, RTC "shall have the same powers and rights to carry out its duties with respect to [financial institutions subject to its resolution authority] as the [FDIC] has under sections 11, 12, and 13 of the Federal Deposit Insurance Act ["the FDI Act"] with respect to [depository institutions insured by the FDIC]." 12 U.S.C. § 1441a(b)(4). Section 13(c) of the FDI Act provides that the FDIC is authorized, among other things, to make loans or contributions to, or make deposits in, certain insured depository institutions or other companies under certain circumstances. *See* 12 U.S.C.

---

[22] Because we conclude that RTC comes within the corporation coverage clause, we need not address whether RTC might also be considered an "executive department" or an "independent Federal establishment" within the meaning of section 3(1).

[23] Our analysis of RTC is supported by the fact that the Fiscal Year 1991 Budget treats RTC, not as a privately owned government-sponsored enterprise, but as an independent federal agency. *See* Executive Office of the President of the United States, *Budget of the United States Government, Fiscal Year 1991* A-21 to A-23, A-140 to A-142, A-271, A-1181 to A-1182, A-1213 to A-1226 (1990). *See supra* note 15.

30

§ 1823(c). This broad grant of authority to provide financial assistance in case resolutions has been interpreted to include the authority to issue notes evidencing the FDIC's obligation to provide certain sums at a future time. *See infra* note 29. Since FIRREA provides that RTC shall have the same authority to provide assistance in case resolutions as the FDIC possesses under sections 11, 12, and 13 of the FDI Act,[24] it follows that RTC is authorized to issue obligations when providing financial assistance in case resolutions. Accordingly, we conclude that RTC has the authority under 12 U.S.C. § 1441a(b)(4) to issue "obligations."

There is really no doubt that Congress intended RTC to have such authority. There are repeated, explicit references throughout the statute to RTC's authority to issue obligations. Subsection 21A(b)(7) of the FHLB Act, as added by FIRREA, for example, provides that *"[RTC's] authority to issue obligations* and guarantees shall be subject to general supervision by the Oversight Board . . . and shall be consistent with subsection (j)." 12 U.S.C. § 1441a(b)(7) (emphasis added). Subsection (j)(1) even establishes a formula for calculating the maximum dollar amount of obligations that RTC may have outstanding at any given time. *Id.* § 1441a(j)(1).[25] In addition, the provision that requires RTC to submit periodic financing requests to the Oversight Board states that such requests must include "any proposed use of *notes, guarantees or other obligations." Id.* § 1441a(b)(13)(C) (emphasis added). Finally, FIRREA provides that "[t]he full faith and credit of the United States is pledged to the payment of *any obligation issued by [RTC],* with respect to both principal and interest," if the obligation states its principal amount and its date of maturity. *Id.* § 1441a(j)(3) (emphasis added).

The legislative history of FIRREA affirmatively supports the conclusion that RTC has authority to issue obligations. In pressing for limitations on RTC's authority to issue obligations, Congressman Gonzalez, the Chairman of the House Banking Committee and the principal sponsor of FIRREA in the House, pointed out that:

> [U]nder this bill, the RTC will have all of the case resolution powers of the FDIC and the FSLIC as we have known them.

---

[24] *See, e.g.,* 135 Cong. Rec. 12,110 (1989) ("RTC will have all of the case resolution powers of the FDIC and the FSLIC *as we have known them.*") (emphasis added).

[25] Subsection (j)(1) provides that:

Notwithstanding any other provision of this section, the amount which is equal to—
    (A) the sum of—
        (i) the total amount of contributions received from [REFCORP]; and
        (ii) the total amount of outstanding obligations of [RTC]; minus
    (B) the sum of—
        (i) the amount of cash each held by [RTC]; and
        (ii) the amount which is equal to 85 percent of [RTC's] estimate of the
           fair market value of other assets held by the Corporation, may not
           exceed $50,000,000,000.

12 U.S.C. § 1441a(j)(1). RTC thus may issue obligations up to the amount that is equal to $50 billion, plus its cash, plus 85% of its assets, less any amounts received from REFCORP.

31

This broad grant of power includes the ability to provide financial assistance to acquirers of insolvent thrifts, *assistance such as notes.*

135 Cong. Rec. 12,110 (1989) (emphasis added).[26] Congressman Gonzalez and others even expressed concern over the extent to which FSLIC, in late 1988, had exercised its authority to issue notes, and emphasized that since RTC would have this same authority, an explicit limit on the dollar amount of such obligations was necessary. *See id.*; *see also id.* at 12,111 (statement of Rep. Price) ("Currently under both the House and the Senate bill, the RTC has the authority to issue notes or other obligations with no apparent limit."); *id.* at 12,112 (statement of Rep. Wylie) ("The administration recognizes the need to place a cap on the aggregate amount of RTC notes and obligations based on last year's FSLIC experience.").[27]

Finally, and significantly, FSLIC, which previously fulfilled RTC's case resolution role, had itself issued obligations under the authority of the case resolution powers conferred by 12 U.S.C. § 1729(f) (1988), *repealed by* FIRREA, Pub. L. No. 101-73, § 407, 103 Stat. 183, 363 (1989).[28] *See* 68 Comp. Gen. 14 (1988) (FSLIC has authority to issue notes in connection with case resolutions).[29] And, as noted previously, Congress intended RTC to have essentially the same case resolution powers that FSLIC had. *See supra* pp. 31-32.

---

[26] *See also Problems of the Federal Savings and Loan Insurance Corporation: Hearings Before the Senate Comm. on Banking, Housing, and Urban Affairs,* 101st Cong., 1st Sess., pt. II, at 590 (1989) ("*1989 Senate FSLIC Hearings*") (statement of Richard Darman, Director, Office of Management and Budget) (RTC may, like FSLIC, issue promissory notes in resolving cases).

[27] Congressman Gonzalez's amendment was adopted by the House, and its key provisions ultimately became subsection 21A(j) of the FHLB Act, 12 U.S.C. § 1441a(j).

[28] The text of former 12 U.S.C. § 1729(f)(1)-(4), which described FSLIC's authority to provide assistance in case resolutions, used virtually identical language as the statute describing the comparable authority of the FDIC, 12 U.S.C. § 1823(c)(1)-(4).

[29] In concluding that FSLIC had the authority to issue notes, the Comptroller General relied not only on FSLIC's statutory authority to provide assistance in case resolutions, but also upon an express statutory grant of authority "to issue notes, bonds, debentures or other such obligations." 68 Comp. Gen. at 16 (citing 12 U.S.C. § 1725(d) (1988), *repealed by* FIRREA, Pub. L. No. 101-73, § 407, 103 Stat. at 363). The absence of a similar provision in the FDI Act might be taken to suggest that Congress intended the FDIC to have less case resolution authority than FSLIC. It is clear, however, in this context that this was not Congress' intent. The FDIC's statutory authority to provide assistance, read together with other provisions of the FDI Act, which expressly recognize the power to issue obligations, *see, e.g.,* 12 U.S.C. § 1825(a) (discussing tax treatment of "notes, debentures, bonds, or other such obligations" issued by the FDIC); *id.* § 1825(c) (limits on FDIC's authority to issue notes); *id.* § 1826 (directing Secretary of Treasury to prepare "forms of notes, debentures, bonds, or other such obligations" for issuance by FDIC), is sufficiently broad to encompass the issuance of notes in connection with case resolutions. Moreover, the FDIC has issued such notes in case resolutions. *See 1989 Senate FSLIC Hearings* at 168 (statement of L. William Seidman, Chairman, Federal Deposit Insurance Corporation); Office of Management and Budget, *Budget of the United States Government, Fiscal Year 1990, Appendix* at I-Z24 (1989) (listing notes issued to acquiring banks as a liability of FDIC).

32

# CONCLUSION

For the foregoing reasons, we conclude that RTC is a "Federal agency" authorized to issue "obligations," within the meaning of the FFB Act. Accordingly, section 6 of the FFB Act authorizes RTC "to issue or sell such obligations directly to the Bank," and further authorizes the Bank, in turn, to purchase such obligations. 12 U.S.C. § 2285. RTC is therefore authorized to issue directly to the Bank those promissory notes it would otherwise have issued to depository institutions or other companies in the course of resolving cases.

J. MICHAEL LUTTIG
*Principal Deputy*
*Assistant Attorney General*
*Office of Legal Counsel*